**Rosen, Tsionis & Pizzo, PLLC**
38 New Street
Huntington, New York 11743
(631) 423-8527
Avrum J. Rosen, Esq.
Alex E. Tsionis, Esq.
Daniel J. LeBrun, Esq.

*Counsel to the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:                                                          Case No.: 25-71121-ast

       WA3 PROPERTIES RENTON LLC, *et al.*,          Chapter 11
                                          (Jointly Administered)
                        Debtors.
-------------------------------------------------------------X

**MOTION FOR THE ENTRY OF AN ORDER UNDER BANKRUPTCY CODE
SECTIONS 105 AND 363 AND BANKRUPTCY RULES 2002, 6004, AND 9004: (I)
AUTHORIZING THE SALE OF THE DEBTORS' PROPERTIES TO THE PROPOSED
STALKING HORSE BIDDER, SUBJECT TO HIGHER AND/OR BETTER OFFERS AT
AUCTION; (II) APPROVING A CERTAIN ASSET PURCHASE AGREEMENT; (III)
AUTHORIZING A CERTAIN BREAK-UP FEE; (IV) DEEMING CERTAIN LEASES
TERMINATED; (V) ALTERNATIVELY, AUTHORIZING THE SALE OF THE
DEBTORS' PROPERTIES FREE AND CLEAR OF ANY AND ALL LEASES;
AND (VI) FOR RELATED RELIEF**

TO:   THE HONORABLE ALAN S. TRUST
       CHIEF UNITED STATES BANKRUPTCY JUDGE

      WA3 Properties Renton LLC ("Renton"), WA3 Properties Talbot LLC ("Talbot") and

WA3 Properties Univ LLC ("Univ"), the above-captioned jointly administered debtors and debtors

in possession (collectively, the "Debtors"), by and through their counsel, Rosen, Tsionis & Pizzo,

PLLC, respectfully submit this motion (the "Motion") seeking the entry of an order, substantially

in the form of the proposed order annexed hereto, under sections 105 and 363 of Title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2002, 6004 and 9004 of the Federal Rules

of Bankruptcy Procedures (the "Bankruptcy Rules"): (i) authorizing the Debtors' sale of their real

properties commonly known as: (a) 80 SW 2nd Street, Renton, Washington 98057 (the "Renton

Property"); (b)  4430 Talbot Rd S, Renton, Washington 98055 (the "Talbot Property"); and (c) 5520 Bridgeport Way W, University Place, Washington 98467 (the "University Property") (collectively,  the "Properties") to the proposed stalking horse bidder, US Healthcare Group LLC (the "Stalking Horse Bidder"), or to the highest and/or best offer at an auction, free and clear of all liens, claims, encumbrances and other interests with such liens, claims, encumbrances and other interests to attach to the proceeds of the sale for good and valuable consideration; (ii) approving the proposed Asset Purchase Agreement (the "APA") between the Debtor and the Stalking Horse Bidder, substantially in the form annexed hereto as **Exhibit "A"**; (iii) approving the proposed break-up fee of three percent (3%) of the Purchase Price (defined below) of the Properties to the Stalking Horse Bidder; (iv) deeming the non-residential Leases (defined below) between the Debtor and the VHS Entities (defined below) terminated; (v) in the alternative, authorizing the sale of the Properties free and clear of any and all leases under section 363(f)(4) and/or (f)(5); together with (vi) such other, further, and different relief as this Court deems, just, proper and equitable. In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1408, *et seq*.

2.      The statutory predicates for the relief sought in this Motion are sections 105 and 363(b) and (f) of the Bankruptcy Code, and Rules 2002, 6004, and 9004 of the Bankruptcy Rules.

## BACKGROUND

I.    **The Debtors' Bankruptcy Filings and Procedural History**

3.      On March 24, 2025, the Debtors filed voluntary petitions for relief pursuant to

Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York.

4.      Each of the Debtors continues to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or committee has been appointed in any of the jointly administered Debtors' Chapter 11 cases.

5.      Each of the Debtors is a Delaware limited liability company with its principal place of business located at 1999 Flatbush Avenue, Brooklyn, New York 11234. Each of the Debtors is ultimately managed by the GCM Manager, which Samuel Goldner manages.

6.      By Order entered on May 12, 2025 [ECF No. 32], the Court authorized the joint administration of the Debtors' Chapter 11 cases.

## II.     The Properties and the Leases

7.      Renton is the owner of the real property commonly known as 80 SW 2nd Street, Renton, Washington 98057 (the Renton Property described herein). The Renton Property is improved by a 99-bed skilled nursing facility.

8.      Talbot is the owner of the real property commonly known as 4430 Talbot Rd S, Renton, Washington 98055 (the Talbot Property described herein). The Talbot Property is improved by a 136-bed skilled nursing facility.

9.      Univ is the owner of the real property commonly known as 5520 Bridgeport Way W, University Place, Washington 98467 (the University Property described herein). The University Property is improved by a 120-bed skilled nursing facility.

10.      Prior to the Petition Date, the Debtors each executed operating leases with certain entities with respect to the Properties as follows:

(i)     the Renton Property was leased (the "Renton Lease") by Renton to Southwest 2nd Street Healthcare LLC (the "Renton Tenant");

(ii)    the Talbot Property was leased (the "Talbot Lease") by Talbot to Talbot Rd S 1 Healthcare LLC (the "Talbot Tenant"); and

(iii)   the University Property was leased (the "Univ Lease", and together with the Renton Lease and Talbot Lease, the "Leases") by Univ to Bridgeport Way W Healthcare LLC (the "Univ Tenant", and together with the Renton Tenant and Talbot Tenant, the "Tenants").

11.     Upon information and belief, the Tenants are affiliated entities under the common control and management of Vertical Health Services LLC ("VHS"). The Tenants, together with VHS, are referred to herein collectively as the "VHS Entities."

12.     As of the Petition Date, VHS occupied each of the Properties and operated the nursing home facilities on each of the Properties through the VHS Entities as lessees.

13.     Due to, amongst other things, the VHS Entities' failure to pay rent under the Leases, the Debtors exercised their rights under the Leases and transmitted a formal termination letter, dated July 2, 2025 (the "Termination Letter"), terminating the Leases. A Copy of the Termination Letter is annexed hereto as **Exhibit "B"**. Indeed, prior to the termination of the Leases, notices of events of default (the "Notices of Default") were sent to the VHS Entities on no less than four (4) separate occasions prior to the Petition Date. Copies of the Notices of Default are annexed hereto as **Exhibit "C"**.

14.     On February 21, 2024, the VHS Entities commenced an action against the Debtors and others in the Superior Court for King City, Washington, Index No. 24-2-03923-6 KNT (the


"State Court Action"), alleging that, amongst other things, the Debtors breached the Leases and payment agreements under the Leases. *See* Adv Proc. No. 25-08048, ECF No. 1.

15.     On March 7, 2024, the Debtors filed an answer with counterclaims to the VHS Entities' complaint, asserting that, amongst other things, the VHS Entities breached the Leases by failing to make rent payments under the Leases for periods of time and that the Leases should be declared terminated. *Id.*

16.     On April 9, 2025, the Debtors removed the State Court Action to the instant Court and was assigned Adv. Proc. No. 25-08048-ast.

17.     As a result of the foregoing, the Leases have been terminated and are of no force and effect.

## III.    The Secured Debt

### A.    Renton and Talbot Secured Debt

18.     On or about May 5, 2022, Renton and Talbot entered into a loan agreement (the "Renton-Talbot Loan Agreement") with Merchants Bank of Indiana ("MBI"). Pursuant to the Renton-Talbot Loan Agreement, MBI, among other things, extended a loan to Renton and Talbot in the principal amount of Thirty-Five Million Dollars ($35,000,000.00) (the "Renton and Talbot Loan").

19.     The Renton and Talbot Loan is evidenced by a promissory note dated May 5, 2022, executed by Renton and Talbot in favor of MBI in the principal amount of Thirty-Five Million Dollars ($35,000,000.00).

20.     The Renton and Talbot Loan, together with any extensions, renewals, replacements, increases, or modifications thereof, is secured by, among other things, a Real Estate Deed of Trust, Security Agreement, and Assignment of Leases and Fixture Filing dated May 5, 2022. This

instrument was executed and delivered by Renton and Talbot in favor of MBI and recorded on May 10, 2022, as Instrument No. 20220410001393 in the Recorder's Office of King County, Washington, encumbering the Renton and Talbot Properties.

21.     On June 5, 2025, MBI filed a proof of claim docketed as Claim No. 2 on the Court's Claims Register in the Renton estate. According to MBI's claim, MBI asserts that as of the Petition Date, it was owed \$16,640,356.25[1] on account of the Renton and Talbot Loan. The Renton and Talbot Debtors have been making adequate protection payments at the contract rate since their cases were commenced.

22.     In addition, on April 27, 2025, Legacy United Corp. filed a proof of claim docketed as Claim No. 1 in the Renton estate, asserting a secured claim against the Renton Property in the amount of \$263,354.40.[2] Accordingly, the combined secured debt encumbering the Renton and Talbot Properties is approximately \$16,903,710.65.

**B.     Univ Secured Debt**

23.     On or about July 19, 2022, Univ entered into a loan agreement (the "Univ Loan Agreement") with MBI. Pursuant to the Univ Loan Agreement, MBI, among other things, extended a loan to the Debtor in the principal amount of Fifteen Million Five Hundred and Fifty Thousand Dollars (\$15,550,000.00) (the "Univ Loan").

24.     The Univ Loan is evidenced by a promissory note dated July 19, 2022, executed by Univ in favor of MBI in the principal amount of Fifteen Million Five Hundred and Fifty Thousand Dollars (\$15,550,000.00).

25.     The Univ Loan, together with any extensions, renewals, replacements, increases,

---

[1] An official payoff quote regarding the Renton and Talbot Loan will be requested prior to the closing of the Renton and Talbot Properties, and MBI will be paid its allowed secured claim at the closing of the sale of the Renton and Talbot Properties.
[2] The Debtors dispute this claim and reserve all rights in that regard.

or modifications thereof, is secured by, among other things, a Real Estate Deed of Trust, Security Agreement, and Assignment of Leases and Fixture Filing dated July 19, 2022. This instrument was executed and delivered by Univ in favor of MBI and recorded on July 20, 2022, as Instrument No. 202207200213 in the Recorder's Office of Pierce County, Washington, encumbering the Property.

26.     On June 5, 2025, MBI filed a proof of claim docketed as Claim No. 1 on the Court's Claims Register in the Univ estate. According to MBI's claim, MBI asserts that as of the Petition Date, it was owed $10,542,337.50[3] on account of the Univ Loan. Upon information and belief, there is no other secured debt encumbering the University Property. The Univ Debtor has been making adequate protection payments at the contract rate since its case was commenced.

27.     In total, the secured debt encumbering all three Properties is approximately $27,446,048.15.

## IV.    The Marketing of the Properties

28.     On April 22, 2025, the Debtors filed applications seeking the entry of an order to retain Blueprint Healthcare Real Estate Advisors LLC ("Blueprint" or "Broker"), as their real estate broker. On or about April 25, 2025, the Court entered Orders authorizing the Debtors' retention of Blueprint as their real estate broker.

29.     Blueprint has been actively marketing the Properties since approximately the date the Court authorized its retention. As a result of Blueprint's marketing efforts, the Debtors have received interest in the Properties from several parties, including the Stalking Horse Bidder.

---

[3] An official payoff quote regarding the Univ Loan will be requested prior to the closing of the University Property, and MBI will be paid its allowed secured claim at the closing of the sale of the University Property.

## V.    The Bidding Procedures

30.    On June 24, 2025, the Court entered a Stipulation and Order by and between counsel to the Debtors, counsel to the secured lenders, and the U.S. Trustee, approving certain bidding procedures [ECF No. 66] (the "Bidding Procedures").

31.    Additionally, on July 1, 2025, the Court entered an Order, amongst other things, authorizing the Debtors to sell the Properties to the highest and best bidder at an auction sale to be held on July 31, 2025. *See* ECF No. 82.

32.    The Bidding Procedures provide, in relevant part, that:

> The Debtors may select a stalking horse bidder (the "**Stalking Horse Bidder**") and enter into a definitive asset purchase agreement ("**Stalking Horse Agreement**") on or before July 1, 2025 (the "**Stalking Horse Deadline**") and may provide the Stalking Horse Bidder with reasonable bidding protections (subject to Bankruptcy Court approval), provided, however, that if any proposed Stalking Horse Agreement does not provide for sufficient cash consideration to pay such applicable Lender's mortgage claims, fees, costs and other obligations in full and in cash at the Closing Date (defined below) of such property sale or on the effective date of Chapter 11 plan that contemplates the sales, the written consent of the applicable Lender to the selection of the Stalking Horse Bidder and entry into the Stalking Horse Agreement shall be required.).

## VI.    Proposed Stalking Horse Offer and Sale

33.    On July 1, 2025, the Debtors entered into the APA with the Stalking Horse Bidder.

34.    The Debtors received a formal offer from the Stalking Horse Bidder to purchase the Properties: (a) if the Leases with the existing VHS Entities of the Properties are terminated prior to closing, then $45,000,000.00; or (b) if the Leases with the existing VHS Entities of the Properties are not terminated prior to closing, then $42,000,000.00 (in either case, the aggregate amount to be referred to as the "Purchase Price"), subject to higher and better offers at an auction.

35.    An allocation of the stalking horse bid Purchase Price amongst the Properties is as follows:

If the Purchase Price is $45,000,000:

| FACILITY | ALLOCATION |
|---|---|
| Univ Property | $16,000,000.00 |
| Renton Property and Talbot Property | $29,000.000.00 |
| **TOTAL** | **$45,000,000.00** |

If the Purchase Price is $42,000,000:

| FACILITY | ALLOCATION |
|---|---|
| Univ Property | $15,000,000.00 |
| Renton Property and Talbot Property | $27,000.000.00 |
| **TOTAL** | **$42,000,000.00** |

36.    As discussed further herein, and as reflected in the offer made by the Stalking Horse Bidder, the Debtors submit that a sale of the Properties would generate a higher sale price if the Properties are sold free and clear of the Leases with the VHS Entities.

**VII.    Principal Terms of the APA**

37.    Subject to the Court's approval, the principal terms of the APA are below:[4]

Purchase Price: $42,000,000.00 - $45,000,000.00

Downpayment: $865,385.00 (see section 2.06)

Closing: The first Business Day of a calendar month that occurs at least ninety (90) days after entry of the Sale Order, subject to extension (see section 3.01).

No Other Warranty: The Properties are being sold "**AS-IS**", "**WHERE-IS**" **AND "WITH ALL FAULTS**", subject to the Leases if the Debtors doe not terminate the Leases as further described in Section 6.13 of the APA.

---

[4] The description of the principal terms of the APA set forth herein is for the convenience of the Court and other parties in interest. In the event of any inconsistency between this description and the APA, the terms of the APA shall govern. Capitalized terms used in this summary and not otherwise defined herein have the meanings given to such terms in the APA.

<u>Higher and Better</u>: The sale of the Properties is subject to higher and better offers in accordance with the Bidding Procedures.

<u>Break-Up Fee</u>: This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing: (v) By either Buyer or Sellers if any Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or any portion of the Business or the Purchased Assets in a transaction or series of transactions with one or more Person (such event, an "***Alternative Transaction***"); provided that notwithstanding anything contained herein to the contrary, upon termination of this Agreement under this provision in connection with the occurrence of an Alternative Transaction, Sellers, in accordance with the Bidding Procedures Order and the Sale Procedures Order, shall pay to Buyer directly from the proceeds of the consummation of the Alternative Transaction an amount in cash equal to THREE PERCENT (3%) of the applicable Purchase Price (the "***Break-Up Fee***"); (vii) Automatically and without any action by either Buyer or Sellers if the Bankruptcy Court approves an offer to sell the Purchased Assets to a third party other than Buyer, provided, however, that in such circumstances Buyer shall be paid the Break-Up Fee directly from the proceeds of the closing of such alternative sale.

<u>Operator Contracts</u>: From the date of the Sale Order or Plan Confirmation Order(s), as applicable, until the Closing, Sellers shall use best efforts to terminate the WA3 Leases and use best efforts to replace the WA3 Tenants with the WA3 Replacement Operators. However, if Sellers do not, despite their best efforts, terminate the WA3 Leases and replace the WA3 Tenants with the WA3 Replacement Operators, then the Purchase Price shall be reduced in accordance with Section 2.05 hereof, and Sellers shall assign the WA3 Leases to Buyer or Buyer Designees. Sellers hereby disclose to Buyer that as of the Execution Date, Sellers consider the WA3 Tenants under the WA3 Leases to be in default thereunder. Additionally, notwithstanding anything contained herein to the contrary and if allowed by the Bankruptcy Court, Buyer agrees to allow Sellers to pursue at Sellers' discretion, for a period of up to ninety (90) days after the Stalking Horse Designation Date (such period, the "***WA3 Remedies Period***"), all legal and equitable actions and remedies to terminate the WA3 Leases and replace the WA3 Tenants with the WA3 Replacement Operators, including without limitation by seeking an Order from the Bankruptcy Court.

<u>Adequate Funds</u>: As of the Execution Date, Buyer has funds, or the ability to obtain such funds, in cash in amounts equal to the Purchase Price and other funds needed to consummate the transaction
and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transaction contemplated herein. Buyer does not have any financing or equity investment contingency hereunder of any nature whatsoever.

<u>No Guarantee of License</u>: Buyer acknowledges that the Business operations are regulated by local, state, or federal Laws and are conducted under a license or licenses issued or authorized by the applicable state of operation of the Facilities. Buyer acknowledges that Buyer shall be responsible, at Buyer's sole cost and expense, for obtaining any and all governmental or quasi- governmental approvals necessary for Buyer's (or its Affiliate's) intended use or development of the Real Property, including but not limited to, the Permits and Regulatory Approvals and its licensing of the facilities or ancillary businesses by the applicable state and any platting or zoning, and other such matters. Seller agrees to use commercially reasonable efforts to assist, or cause the Facilities to assist, Buyer with obtaining any Permits and Regulatory Approvals required to own the Purchased Assets.

38.    As a condition to serving as the Stalking Horse Bidder and establishing a floor price for the Properties, the Stalking Horse Bidder has requested, and the Debtors have agreed to provide, subject to this Court's approval, a break-up fee in the amount of three percent (3%) of the Purchase Price (the "<u>Break-Up Fee</u>").

39.    The Break-Up Fee would be payable to the Stalking Horse Bidder in the event that (a) the Debtors consummate an alternative transaction with a party other than the Stalking Horse Bidder, or (b) the Court approves the sale of the Properties to a third party other than the Stalking Horse Bidder.

40.    The Debtors submit that the overall terms of the proposed APA are favorable to the estate and creditors and have been negotiated at arm's length with the Stalking Horse Bidder.

41.    The Debtors estimate that even with the lesser sale price of $42,000,000.00, the net benefit to the estate from the sale of the Properties, excluding administrative expenses, would be approximately $13,923,951.80, detailed as follows:

| SALE PRICE | | $42,000,000.00 |
|---|---|---|
| LESS: | | |
| BROKER 1.5% | $630,000.00 | |
| SECURED CLAIMS (MBI) | $27,182,693.80 | |
| SECURED CLAIM (Legacy) | $263,354.50 | |
| NET SALE PROCEEDS | | **$13,923,951.70** |

## REQUESTED RELIEF

42.　　By this Motion, the Debtors seek the entry of an order, substantially in the form of the proposed order annexed hereto:

> (a)　　Authorizing the Debtors to sell their Properties to the Stalking Horse Bidder, subject to higher and/or better offers at an auction;
> (b)　　Approving the APA between the Debtors and the Stalking Horse Bidder;
> (c)　　Approving the Break-Up Fee to the Stalking Horse Bidder;
> (d)　　Deeming the Leases terminated;
> (e)　　In the alternative, authorizing the sale of the Properties free and clear of the Leases; and
> (f)　　Granting such other and further relief as is just and proper under the circumstances.

## LEGAL STANDARD

43.　　Bankruptcy Code Section 363(b) provides that a "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…" 11 U.S.C. § 363(b). A trustee must demonstrate a sound business justification for the sale or use of assets outside the ordinary course of business. *See, e.g., Licensing By Paolo, Inc., v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *In re Lionel Corp.,* 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Global Crossing Ltd.,* 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989).

44.     Specifically, under Bankruptcy Code Section 363(f), a trustee may sell property of the estate free and clear of any interest in such property of an entity other than the estate only if at least one of the following conditions is satisfied:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in *bona fide* dispute; or

(e)     such entity may be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f).

45.     Since Bankruptcy Code Section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements shall suffice to approve the sale of the Properties free and clear of liens, claims, encumbrances and interests. *Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1147, n.24 (6th Cir. 1991) (recognizing that Bankruptcy Code section 363(f) is written in the disjunctive and holding that the court may approve a sale "free and clear" provided that at least one subsection of section 363(f) is met.) *See also, In re Elliot,* 94 B.R. 343, 345 (E.D.Pa. 1988).

46.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C § 105. *See Adelphia Bus. Solutions, Inc. v. Abnos*, 482 F.3d 602, 609 (2d Cir. 2007) ("Section 105(a) grants broad equitable power to the bankruptcy courts to carry out the provisions of the Bankruptcy Code so long as that power is exercised within the confines of the Bankruptcy Code."); *see e.g., In re MF Global Holdings, Ltd.*, 464 B.R. 619, 623 (Bankr. S.D.N.Y. 2012)

13

(recognizing the bankruptcy court's "inherent authority 'to control disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants'") (*quoting Lester–Krebs, Inc. v. Geffen Records, Inc.*, No. 85 Civ. 6320, 1985 U.S. Dist. LEXIS 13201, at *4 (S.D.N.Y. Dec. 4, 1985)); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 97 (2d Cir. 2012) (same).

## DISCUSSION

### I.    The Sale of the Properties is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved

47.     Here, there are sound business reasons justifying the sale of the Properties to the Stalking Horse Bidder, subject to higher and/or better offers at an auction.

48.     *First*, the Debtors have met the requirements outlined in section 363(f)(3) of the Bankruptcy Code. Starting with the Renton and Talbot Properties, the proposed sale price for those Properties is $27,000.000.00 (under the lower-priced scenario). The secured debt encumbering the Renton and Talbot Properties is approximately $16,903,710.65, which consists of: (i) the secured debt owed to MBI in the approximate amount of $16,640,356.25, which secured debt is cross collateralized between both the Renton and Talbot Properties; and (ii) a lien secured against the Renton Property only, filed by Legacy United Group Corp. in the amount of $263,354.40, which the Debtors dispute. Therefore, since the proposed sale price exceeds the secured debt associated with the Renton and Talbot Properties, the Court may authorize the Debtors to sell the Renton and Talbot Properties free and clear of all liens, claims, encumbrances, and other interests.

49.     Turning to the University Property, the Court may authorize the sale of that property free and clear under section 363(f)(3) as well, as the lower priced sale is $15,000,000.00, and the secured debt owed to MBI is approximately $10,542,337.50. Additionally, the starting bid for the auction of the Properties will be determined by the Debtors, in their business judgment, but

will not fall below the amount required to fully pay all creditors with a security interest in the Properties at the time of closing the sale. The Debtors reserve their right to withdraw the Properties from the auction at any time and for any reason without prior notice.

50.      *Second*, sound business reasons support the sale because it allows the Debtors to maximize the return to the estates' creditors by selling their Properties, which have substantial value.

51.      *Third*, after engaging in good-faith, arms-length negotiations with the Stalking Horse Bidder, the Debtors and the Stalking Horse Bidder have agreed to the APA's terms, subject to this Court's approval. The Debtors anticipate that they will receive substantial net equity from these proposed sales that will benefit their estates.

52.      Given that there are valid business reasons for the proposed sales, that fair and reasonable consideration is being provided, that the transaction has been negotiated in good faith, and that adequate and reasonable notice will be given, this proposed sale represents a sound exercise of the Debtors' business judgment and should be approved.  *See Lionel*, 722 F.2d at 1071 (setting forth the "sound business purpose" test).

## II.    <u>The Break-Up Fee</u>

53.      As mentioned above, the Court has already entered an Order approving the Bidding Procedures, as well as an Order authorizing the sale of the Properties free and clear of all liens with such liens to attach to the proceeds of sale with the same validity and with the same priority that existed prior to the sale.

54.      The Bidding Procedures provide in paragraph E that:

> The Debtors may select a stalking horse bidder (the "**Stalking Horse Bidder**") and enter into a definitive asset purchase agreement ("**Stalking Horse Agreement**") on or before July 1, 2025 (the "**Stalking Horse Deadline**") and may provide the

> Stalking Horse Bidder with reasonable bidding protections (subject to Bankruptcy Court approval)…

Bidding Procedures, paragraph E.

55.    Accordingly, by this Motion, the Debtors also seek approval of the Break-Up Fee to the Stalking Horse Bidder.

56.    When evaluating the appropriateness of break-up fees in the bankruptcy context, Courts in the Second Circuit apply a modified business judgment rule. *See e.g. In re 995 Fifth Ave. Assocs., L. P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that, where the proposed break-up fee is too large, it is not protected by the business judgment rule and is subject to court review). Under this analysis, Courts generally consider the following three issues: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" *In re Integrated Res.*, 147 B.R. 650, 657 (S.D.N.Y. 1992).

57.    The Debtors submit that the proposed Break-Up Fee satisfies this standard.

58.    *First,* the Break-Up Fee is necessary to induce the Stalking Horse Bidder to commit to a floor price for the Properties, thereby establishing a minimum bid for other potential bidders and ensuring that the Debtors receive fair market value for the Properties. Further, the APA was negotiated at arm's length by and between the Debtors and the Stalking Horse Bidder. There is no self-dealing or manipulation, as the Stalking Horse Bidder is an unrelated third party with no prior relationship with the Debtors or their management.

59.    *Second*, the Break-Up Fee is reasonable in relation to the Stalking Horse Bidder's efforts and expenses in conducting due diligence and negotiating the terms of the APA. The Debtors submit that the Stalking Horse Bidder has expended, and will continue to expend, considerable time and resources in connection with its due diligence review and the negotiation of

the APA. The proposed sale of these Properties takes place within the highly regulated arena of assisted living facilities, and the parties have retained specialized counsel who have engaged in sophisticated negotiations, in addition to extensive due diligence efforts.[5]

60.    *Third*, the Break-Up Fee represents a reasonable percentage of the purchase price, consistent with break-up fees approved in similar cases in this Circuit. *See In re T.V.S.I. Holdings, Inc. et al.,* Nos. 90 B 13581-13586, 90 B 13856-13864 (CB), slip op. (Bankr. S.D.N.Y. 1991) (approving $3.5 million break-up fee in transaction involving $30 million in cash and $108 million in preferred stock, equating to a 2.5% fee of overall transaction); *see also In re Crowthers McCall Pattern, Inc.,* 114 Bankr. 877 (Bankr. S.D.N.Y. 1990) (approving $500,000 break-up fee in a $45 million sale, equating to 1.1% fee of overall transaction). In the instant case, the maximum amount of the Break-Up Fee is 3% of the Purchase Price ($45,000,000.00 if the Leases are terminated prior to closing), which equates to $1,350,000.00 and easily falls within the range of reasonableness described above.

61.    *Fourth*, the Break-Up Fee will not chill bidding but rather will encourage competitive bidding by establishing a floor price and signaling to the market that the Properties have been market-tested. As discussed above, and as outlined in the annexed declaration of the Broker, the Debtors have already received interest from several potential bidders and anticipate active bidding at the auction.

62.    Ultimately, the Debtors believe that the Break-Up Fee will benefit the Debtors' estate and creditors by maximizing the value of the Properties. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to provide such reasonable bidding

---

[5] The Debtors anticipate filing an application seeking to retain special real estate counsel shortly.

protections to the Stalking Horse Bidder as contemplated by the APA, including the Break-Up Fee.

**III.    Sale Free and Clear of Leases**

63.    In addition to the above, by this Motion, the Debtors seek an order deeming the Leases terminated and authorizing them to sell the Properties free and clear of the Leases with the VHS Entities. As set forth above, the Debtors have transmitted at least four (4) Notices of Default to the VHS Entities. As a result of the VHS Entities' failure to cure defaults, including non-payment of rent, the Debtors on July 2, 2025, transmitted to the VHS Entities the Termination Letter, terminating the Leases. As such, the Debtors submit that the Leases have been terminated and that the Debtors should be authorized to sell the Properties free and clear of the Leases.

64.    Additionally, in consultation with the Debtors' retained real estate broker, Blueprint, the Debtors have determined, in their business judgment, that the Properties (as well as the property at 308 W Emma Street, Union Gap, Washington 98903 owned by affiliate debtor Prest Properties LLC) would generate higher sale prices if they are sold free and clear of the Leases. Annexed hereto as **Exhibit "D"** is the declaration of Amy Sitzman, an Executive Managing Director with Blueprint, wherein she states that if the Properties are sold free and clear of the VHS Entities' Leases, the Properties would likely achieve a significantly higher purchase price. Indeed, the Debtors submit that they have received offers for all four (4) properties (including that of Prest Properties LLC) in excess of $70,000,000.00 without the VHS Entities as tenants. It is also evident based upon the APA that this is the case, as the Stalking Horse Bidder's offer reflects two purchase prices, with a higher price being paid without the VHS Entities as tenants. Those offers did not include those with leases in place, so they were not qualified to be stalking horse bidders.

65.     The Debtors submit that the Leases have been validly terminated under their terms due to the VHS Entities' material defaults, including non-payment of rent and other violations of the Leases. The Debtors submit that they have provided proper notice of default on multiple occasions and, following the VHS Entities' failure to cure, served a proper termination notice. Under the terms of the Leases themselves, the Debtors submit that the termination is effective, and the VHS Entities' interests in the Leases have been extinguished.

66.     In the alternative, should the Court determine that the Termination Letter in ineffective in terminating the Leases, the Debtors seek the authority of the Court pursuant to section 363(f)(4) of the Bankruptcy Code to sell the Properties free and clear of the Leases.

67.     Section 363(f)(4) provides that "[t]he trustee may sell property under subsection (b) or (c) of this section free and clear of *any interest* in such property of an entity other than the estate, only if…such interest is in bona fide dispute[]". 11 U.S.C. § 363(f)(4) (emphasis added).

68.     In determining whether a lien or interest is subject to a bona fide dispute, a Court must determine "whether there is an objective basis for either a factual or legal dispute as to the validity of the debt." *In re Williamsburg Boutique LLC*, 663 B.R. 217, 225 (Bankr. S.D.N.Y. 2024) (internal quotations omitted). The Court's "objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute." *In re BDC 56 LLC*, 330 F.3d 111, 118 (2nd Cir. 2003) (quoting *Rimell v. Mark Twain Bank* (*In re Rimell*), 946 F.2d 1363, 1365 (8th Cir. 1991)).

69.     Preliminarily, the VHS Entities' interests under the Leases unquestioningly are contemplated by section 363(f)(4) as "interests". *See In re Downtown Ath. Club of N.Y.C.*, M-47 (JSM), 2000 U.S. Dist. LEXIS 7917, at *11 (S.D.N.Y. June 9, 2000) ("Under the expansive interpretation of 'any interest' under Section 363(f)(4)…asserted possessory rights as lessees fall

within the scope of this section."); *see also In re Eastman Kodak Co.*, No. 12-10202, 2012 Bankr. LEXIS 2746, at *10 (Bankr. S.D.N.Y. June 15, 2012) ("Although § 363(f)(4) is most commonly applied when the entity's 'interest' is a lien or security interest, the plain language of the provision would include an ownership 'interest.'"); *see also In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996) ("it appears that a leasehold interest is a type of "interest" that fits within the plan text of the § 363(f)(4) statute").

70.     In the instant matter, the Debtors submit that, by virtue of the sheer existence of the State Court Action, there can be no doubt that the VHS Entities' interests under the Leases are in bona fide dispute. In the State Court Action, the VHS Entities asserted that the Debtors were in breach of the Leases, and the Debtors counterclaimed, asserting that the VHS Entities breached the Leases, reserving the right to seek a judicial declaration that the Leases were terminated. Additionally, the Debtors have recently transmitted the Termination Letter to the VHS Entities, which the VHS Entities have contested, thus further compounding the dispute as to the rights of the VHS Entities under the Leases. Simply put, there is an objective basis to conclude that there is an active dispute regarding the validity of the VHS Entities' leasehold interests—a dispute the Court need not resolve, merely recognize the existence of, and permit the sale free and clear of those interests.

71.     Alternatively, should the Court wish to avoid the issues posed by section 363(f)(4), section 363(f)(5) provides an alternative basis for relief, as the VHS Entities could be compelled in a legal proceeding to accept monetary satisfaction of their alleged leasehold interests through damages rather than specific performance.

72.     Accordingly, the Debtors respectfully request that the Court authorize the sale of the Properties free and clear of the Leases as being in bona fide dispute pursuant to section

363(f)(4) of the Bankruptcy Code, or pursuant to section 365(f)(5) of the Bankruptcy Code as the VHS Entities being subject to compulsion to accept money satisfaction of such interest.

## NOTICE

73.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) counsel to MBI; (c) counsel to Legacy United Corp.; (d) the VHS Entities or their counsel; (e) all parties who have filed notices of appearance in these cases; (f) all entities known to have expressed an interest in acquiring the Properties; and (g) such other parties as the Court may direct.

74.     The Debtors will be seeking an expedited hearing on this Motion, as time is of the essence given the auction date of July 31, 2025.

[*Remainder of Page Left Blank*]

**WHEREFORE**, the Debtors respectfully request that this Court enter an order, substantially in the form of the proposed order annexed hereto: (i) authorizing the sale of the Properties to the Stalking Horse Bidder, subject to higher and/or better offers at an auction; (ii) approving the APA; (iii) approving the Break-Up Fee to the Stalking Horse Purchaser; (iv) deeming the Leases terminated; (iv) in the alternative, authorizing the sale of the Properties free and clear of any and all leases under section 363(f)(4) and/or (f)(5); together with (vi) such other, further, and different relief as this Court deems, just, proper and equitable.

Dated: July 7, 2025
      Huntington, New York

                                          **Rosen, Tsionis & Pizzo, PLLC**
                                          *Counsel to the Debtors*
                                          *and Debtors in Possession*

                     By:     */s/ Avrum J. Rosen*
                             Avrum J. Rosen, Esq.
                             Alex E. Tsionis, Esq.
                             Daniel J. LeBrun
                             38 New Street
                             Huntington, New York 11743
                             Tel: (631) 423-8527
                             atsionis@ajrlawny.com
                             arosen@ajrlawny.com
                             dlebrun@ajrlawny.com